## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:24-cr-20070-DDC-TJJ** |
| **NEWTON JONES,**<br>**WILLIAM CREEDEN,**<br>**KATERYNA (KATE) JONES,**<br>**WARREN FAIRLEY,**<br>**LAWRENCE McMANAMON, and**<br>**CULLEN JONES** | |
| **Defendants.** | |

## UNITED STATES' MOTION FOR ABROGATION OF ATTORNEY-CLIENT PRIVILEGE BY WAIVER

Now comes the UNITED STATES OF AMERICA, by Duston J. Slinkard, Acting United States Attorney for the District of Kansas, and respectfully requests an order abrogating the attorney-client privilege with respect to the International Brotherhood of Boilermakers Iron Ship Builders, Blacksmiths, Forgers and Helpers union (the "Boilermakers Union") and defining the scope of that waiver.

### I. Background

1. In April 2022, the Government served the Boilermakers Union with a grand jury subpoena seeking documents regarding a series of alleged thefts by officers and employees of the Boilermakers Union. Throughout 2022 and 2023, the Boilermakers Union produced documents in response to the subpoena while retaining its privilege for any attorney-client communications with its then law firm, Blake and Uhlig. However, some of the records provided, including Internation Executive Council Meeting Minutes, contained communications with and advice from Boilermakers Union counsel.

2.  On April 14, 2023, Vice-President John Fultz of the Boilermakers Union filed charges against Boilermakers Union International President Newton JONES under Article 17.1.7 of the Boilermakers Union Constitution.  The Article 17 charges accused JONES of misusing IBB funds for the following:

a)  Unauthorized backpay to his wife Kateryna JONES;

b)  JONES' use of Boilermaker Union funds for domestic meals in vicinity of his home in Chapel Hill; and

c)  JONES' use of Boilermaker Union funds for multiple personal trips to the Ukraine.

### A. Federal Action and the September 2022 Memorandum

3.  On May 30, 2023, Vice-President Fultz presented the charges before a panel of three other vice-presidents pursuant to Article 17 of the Boilermakers Union constitution. The same day, JONES filed an action in federal district court for the District of Kansas to obtain a temporary restraining order against the vice-presidents from pursuing disciplinary charges against him based on alleged constitutional defects.  IBB v. Baca, et al., Case No. 23-2250 (D.Kan.).

4.  During the Article 17 proceeding, Vice President Fultz introduced a legal memorandum authored by Blake and Uhlig attorneys, then-counsel to the Boilermakers Union, dated September 20, 2022 ("the September 2022 Memorandum").  See Attachment A. The September 2022 Memorandum is a fifteen (15) page legal opinion authored by Boilermakers Union General Counsel Michael Stapp and Attorney Jason McClitis addressing the issue of what expenditures Boilermakers Union officials may make with union funds under its constitution and under federal civil and criminal laws governing labor unions.  The September 2022 Memorandum does not address any particular expenditure, or even classes

of expenditures, but instead addresses the general issue of authority of Boilermakers Union officers to spend its funds.  See Attachment A.

5.  On June 2, 2023, the panel of vice-presidents voted 3 to 1, with one abstention to remove JONES as president.  The vice-presidents thereafter named retired International Vice-President- Warren FAIRLEY as the new president of the International and filed a response and counterclaim with the district court also requesting injunctive relief.

6.   On June 16, 2023, Warren FAIRLEY, acting as President appointed by the Executive Council, and relying on the advice of Attorney Antonio Ruiz (current general counsel of the IBB), filed an affidavit under oath in the federal court action, stating in part:

> "I understand that there is an issue regarding a memo prepared by Blake & Uhlig and distributed among the Executive Council members which was recently filed with the court. That memo was presented to the Executive Council on May 30, 2023 by International Vice President John Fultz in support of the charges he filed against Newton B. Jones. Nobody objected to the memorandum being introduced. I understand that there is an assertion of attorney-client privilege as to that document. After learning of such an assertion, I spoke with other members of the Executive Council. During our discussion, I advocated for the waiver of that privilege.  **It is my position that we, as the elected representatives of the IBB, wish to have a full airing of all issues and that the document at issue should not be kept from public view.  A majority of the Executive Council agreed that we would waive any claim of privilege on behalf of the IBB.**"  (emphasis added).

7.  The Government thereafter received a copy of the September 2022 Memorandum. Once Jones was ousted in July 2023, Morgan Pilate began representing the Boilermakers Union for purposes of the grand jury investigation.  In October 2023, the Boilermakers Union, though Morgan Pilate, renewed the International Executive Council's waiver of the attorney client privilege with respect to the September 2022 Memorandum by providing a copy to the grand jury.

**B. Provision of Other Attorney-Client Communications During Investigation**

8.  In April 2024, the grand jury received evidence that former president Newton JONES and former secretary-treasurer William CREEDEN had hired a forensic surveillance firm in Spring 2023 to determine secretly which Boilermakers Union's officers or employees had cooperated in bringing charges against JONES.  The grand jury requested that the Boilermakers Union provide any documentation regarding JONES and CREEDEN's engagement of the surveillance firm.

9.  In response, Morgan Pilate provided a dozen potentially privileged emails in the period from June through August 2023 involving former president JONES and former secretary-treasurer CREEDEN.  In those emails, JONES and CREEDEN discuss the conduct of the unauthorized forensic surveillance of Boilermakers Union officers and employees with Attorneys Michael Stapp and Jason McClitis of the Blake and Uhlig law firm.  Morgan Pilate also provided emails subsequent to JONES' removal in July 2023 between former president Warren FAIRLEY, who succeeded JONES, and Blake and Uhlig attorneys.  Those emails from FAIRLEY also include communications with Attorneys Antonio Ruiz and David Rosenfeld of the law firm Weinberg Roger & Rosenfeld, which succeeded Blake and Uhlig as Boilermakers Union counsel.  Several of those emails make explicit note of the privileged nature of the communications and the need to keep them privileged.  Further, in several of the emails, Attorney Stapp discusses his legal strategy—communications axiomatically protected by the attorney-client privilege--with JONES in the civil action pending over the control of the Boilermakers Union.

11.  On June 20, 2023, Chief District Judge Eric Melgren admonished Blake and Uhlig for acting as personal counsel for JONES in clear conflict of interest with its longstanding

representation of the Boilermakers Union.  See Attachment B, Transcript of June 20, 2023, Hearing, pp. 11-21.  Despite that direct admonishment from the bench, the email communications after June 20 demonstrate that Attorney McClitis of the Blake and Uhlig firm continued to advise JONES and his allies in their personal capacity regarding the unauthorized forensic surveillance program.  In one of those communications in July 2023, Attorney McClitis advises JONES that he wanted to put JONES' agreement with the forensic firm "under privilege protections" and presumably out of reach from JONES' internal opponents and the grand jury.  See Attachment C, Blake and Uhlig Emails, pp. 11, 12, 22-23.

 C. **The Boilermakers Union's Current Position Regarding Waiver of Attorney Client Privilege**

 13. Throughout the investigation, Attorney Melanie Morgan of Morgan Pilate has provided the Government with privilege logs listing documents withheld or redacted due to attorney-client privilege.

 14. On February 26, 2025, the Government inquired with Attorney Morgan over the purpose of some redactions in the meeting minutes of the International Executive Council of the Boilermakers Union, its governing body.  In addition, the Government counsel stated, "my understanding was that the privilege with respect to legal advice from Blake and Uhlig had been waived."

 15. On March 5, 2025, Attorney Morgan responded, "I'll have an update on the redacted documents soon.  We are running down the privilege issue."  On March 21, 2025, Government counsel again inquired Attorney Morgan over the redactions in the meeting minutes.

 16. On March 24, 2025, Attorney Morgan responded that the redactions in certain meeting minutes were made pursuant to attorney-client privilege, but conceded that three of

the redactions were overbroad and provided replacement minutes with reduced redactions.  In

addition, Attorney Morgan stated:

> Just to be clear, the IBB has not waived privilege as to all matters
> involving Blake&Uhlig.   The waiver was limited to the
> September 2022 memo.  If you have information that suggests
> otherwise, please let me know.  The minutes you reference do
> not all involve B&U.

Attachment D, March 2025 Email Chain.

17.   On May 5, 2025, the Government and Attorney Morgan held a telephone

conference over the privilege issue and other outstanding discovery issues.  During that

conversation, the Government requested that Attorney Morgan clarify the position of the

Boilermakers Union regarding its attorney-client privilege and the prior apparent waivers

thereof.  In response, Attorney Morgan stated that she would respond with a position by Friday

May 9, 2025.

18.   On May 6, 2025, Attorney Morgan provided a recap of that discussion with the

government:

> Privilege waiver: The government believes that the IBB has
> waived privilege on all subject matter contained within the
> Indictment based on previous waivers to include Mandient
> communications, the Blake & Uhlig September 2022 memo, and
> Warren Fairley's affidavit in the civil case, consistent with its
> viewpoint of 10th Circuit caselaw regarding piecemeal waivers.
> I agree to review these waivers and caselaw and consult with my
> client regarding this waiver as I don't believe any waiver was
> intended to be a broad, general waiver of privilege.  **Anticipated
> completion date of this task is 7-10 days (May 16).**

Attachment E, May 2025 Email Chain (emphasis added).

19.   On May 16, 2025, the Government and Attorney Morgan held another telephone

conference over the privilege issue.  In that conversation, Attorney Morgan stated that:

--that she had not yet conferred with the International Executive Council over the waiver of privilege issue;

--that she could not properly advise the International Executive Council on the scope of the waiver issue without a formal request or subpoena by either the Government or any of the defendants for specific documents;

--that she could not advise the Boilermakers Union to agree that the scope of its existing waiver included any and all allegations in the Indictment; and

--that her alternative was for the Boilermakers Union to filter all documents and electronic devices in its possession for potentially privileged communications, then provide them only to the specific defendants to whom the legal advice was directed if they made a request for them.

The Government and Attorney Morgan discussed a request from the defendants for defendants' emails stored by the Boilermakers Union. With respect to the last point, Attorney Morgan indicated that her firm had screened all the defendants' emails in the possession of the Boilermakers Union, but not the parties, and that emails that bore some indicia of attorney involvement numbered more than 100,000. When the Government inquired over how long such a process would take, Attorney Morgan did not venture an estimate, but she agreed that the undertaking would be substantial for each defendant who decides, if and when, to assert an advice-of-counsel defense.

20. On May 22, 2025, Attorney Morgan sent an email to the Government with an attached spreadsheet containing 29 documents over which the Boilermakers Union claimed attorney-client privilege. See Attachment F, Clawback Request. Among those documents were eighteen (18) sets of the minutes of the Boilermakers Union International Executive Council and several invoices from a former attorney, David Elbaor. In addition, the Boilermakers Union requested that the Government return or "clawback" sixteeen (16) of those meeting minutes as have been inadvertently produced during the grand jury investigation. Attorney Morgan's request for a clawback of meeting minutes on May 22,

2025, was the first such request since the delivery of the grand jury subpoena in April 2022 and the beginning of the record production in May 2022.

21.  In response to the Government's repeated requests for a position on the scope of the union's previous waivers, Attorney Morgan stated:

> We note that currently under consideration is a waiver of attorney client privilege as to subject matter contained within the Indictment.  I am waiting to receive the defendants specific request as I don't know if an advice of counsel defense is being made as to all allegations in the Indictment or just some. That may moot some, but not all of this clawback.

22.  On May 23, 2025, Government counsel replied to Attorney Morgan's request for a clawback of documents  by asserting that the Government was:

> not agreeing to a claw back based on our analysis that attorney-client privilege has been waived and that this request is untimely as some of these documents were provided to [the Government] over two years ago.  In addition, IEC Meeting Minutes that you have indicated in the spreadsheet are privileged were disseminated by the Union to members and delegates at previous conventions in the "Officers Reports" which waives any potential privilege.

23.  On this day, the Government has filed a trial subpoena duces tecum requesting that the Boilermakers Union provide all defendants' emails within its possession from its email system for the period of the Indictment, that is, from January 2009 until August 2023.

## II. Applicable Principles

### A. The Attorney-Client Privilege

The Supreme Court has affirmed the attorney client privilege as "one of the oldest recognized privileges for confidential communications. . . . intended to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'"  Swidler & Berlin v.

United States, 524 U.S. 399, 403 (1998) (quoting Upjohn Co. v. United States, 449 U.S. 383, 389 (1981)).

The attorney-client privilege thus protects from disclosure confidential communications between a client and an attorney in an effort to obtain legal services.  In re Grand Jury Subpoena Duces Tecum Issued on June 9, 1982, 697 F.2d 277, 278 (10th Cir.1983).  However, because the privilege withholds relevant information from a factfinder, it should be construed narrowly and only apply when necessary to achieve the purpose of encouraging full and frank communications between a lawyer and client.  See In re Grand Jury Proc., 616 F.3d 1172, 1182 (10th Cir. 2010); In re Qwest Commc'ns Int'l Inc., 450 F.3d 1179, 1185 (10th Cir. 2006); United States v. Phelan, 3 F. App'x 716, 718 (10th Cir. 2001).

The party asserting an attorney-client privilege bears the burden of establishing all of its elements and its applicability in a particular situation.  Motley v. Marathon Oil Co., 71 F.3d 1547, 1550 (10th Cir.1995).  The privilege is governed by the common law and is to be strictly construed."  United States v. Merida, 828 F.3d 1203, 1209 (10th Cir. 2016); In re Grand Jury Subpoenas, 144 F.3d 653, 658 (10th Cir. 1998); United States v. Lopez, 777 F.2d 543 (10th Cir. 1985).

### B. Waiver of the Attorney-Client Privilege

Waivers of the attorney-client privilege are unlike waivers in other areas of the law, such as waivers of constitutional rights, which are required to be knowing, voluntary, and express.  Waivers of the evidentiary privileges may be involuntary, negotiated, passive, unintentional, inadvertent, and occur even despite vehement opposition of both attorney and client.  Accordingly, analysis of whether a waiver has occurred must extend far beyond what the client intended to include issues of finality and fairness to all affected parties.

> There is always also the objective consideration that when his conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not.  He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder.  He may elect to withhold or to disclose, but after a certain point his election must remain final.

Wigmore, Evidence § 2327, at 636.

Parties often attempt to waive a portion of a particular communication while retaining privilege over the remainder of the communication.  Similarly, a party may voluntarily disclose a particular communication while asserting privilege over other, similar communications.  The absence of fairness in manipulating an evidentiary rule in that manner is manifest and, as a rule, courts should not countenance it.  See, for example, In re Martin Marietta Corp., 856 F.2d 619, 623 (4th Cir. 1988) (finding that company's submission of letter to prosecutors arguing against its indictment waived confidentiality of underlying communications in trial of former employee facing indictment); United States v. El Paso Co., 682 F.2d 530, 539-41 (5th Cir. 1982) (holding that voluntary waiver of internal documents to auditors prevented firm from asserting privilege over similar documents when subpoenaed by independent auditors).

Accordingly, attempts at partial disclosures of privileged communications constitute a waiver of the entire communication.  Thus, if a party releases part of a document to disclosure, it cannot claim the remainder of the document to be protected.  Similiarly, a party cannot release some documents on a particular subject matter while retaining other documents on the same subject matter as protected.  See Nguyen v. Excel Corp., 197 F.3d 200, 208 (5th Cir. 1999) (holding testimony of executives concerning advice given by attorneys on numerous subjects waived privilege with respect to entire subjects discussed, and observing that

objections over eliciting attorneys' conclusions "were too little, too late."). Jurisprudence prohibiting partial disclosures of privileged communications thus operates as a rule of completion. See Indus. Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Elec. Co., 953 F.2d 1004, 1007 (5th Cir. 1992) ("[D]isclosure of any significant portion of a confidential communication waives the privilege as to the whole.").

The reception of "selective waiver doctrine" in the federal courts has been resoundingly negative. Only the Eighth Circuit has recognized selective waiver doctrine as a viable means of protecting corporate disclosures to government agencies. See Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 611 (8th Cir. 1978) (en banc). All other circuit courts of appeals faced with this issue have not recognized the selective waiver doctrine because of its opposition to the historically narrow and strict construction of the attorney-client privilege. See also 1 Edna Selan Epstein, The Attorney-Client Privilege and the Work-Product Doctrine 494-507 (5th ed. 2007).

Accordingly, while selective waiver doctrine is frequently invoked by corporate counsel, federal courts, including the Tenth Circuit, have provided little or no legitimacy to that argument. In re Qwest Commc'ns Int'l Inc., the Tenth Circuit rejected calls to institute any type of selective or limited waivers of attorney-client privilege and decribing such arguments as an unnatural "leap" beyond of established principles. 450 F.3d 1179, 1190-98 (10th Cir. 2006); United States v. Hudson, 2013 WL 4768084, at *4 (D. Kan. Sept. 5, 2013) ("The Court declines to adopt any form of selective waiver in this case.") (collecting authority).[1]

---

[1] See In re Columbia/HCA Healthcare Corp. Billing Practices Litig., 293 F.3d 289, 302 (6th Cir. 2002) (observing that "any form of selective waiver, even that which stems from a confidentiality agreement, transforms the attorney-client privilege into 'merely another brush on an attorney's

Moreover, Congress specifically refrained from including a selective waiver provision when drafting Rule 502 which codified basic law principles of attorney-client privilege.

> The only justification behind enforcing such [selective waiver] agreements would be to encourage cooperation with the government. But Congress has declined to adopt even this limited form of selective waiver. <u>See</u> Statement of Congressional Intent Regarding Rule 502 of the Federal Rules of Evidence, 154 Cong. Rec. H. 7817 (2008), reprinted in Fed.R.Evid. 502 addendum to comm. n subdivision (d) (noting that Rule 502 "does not provide a basis for a court to enable parties to agree to a selective waiver of the privilege, such as to a federal agency conducting an investigation"). As such, we reject such a theory here.

<u>See</u> <u>In re Pac. Pictures Corp.</u>, 679 F.3d 1121, 1129 (9th Cir. 2012) (rejecting enforcement of government agreement within subpoena that it "not provide the [returned documents] to non-governmental third parties except as may be required by law or court order.").

## C. **The Scope of a Waiver of Attorney-Client Privilege**

As a general rule, once a waiver has been established, federal courts will try to fashion the narrowest possible waiver in conformity with the "fairness" of the particular circumstance. In <u>Hunt v. Blackburn</u>, the Supreme Court introduced the standard of fairness which subsequent courts have identified as the fairness doctrine or fairness principle. 128 U.S. 464, 470-71 (1888) ("When Mrs. Blackburn entered upon a line of defence which involved what transpired between herself and Mr. Weatherford [her lawyer], and respecting which she testified, she waived her right to object to his giving his own account of the matter."). <u>Accord</u>

---

palette, utilized and manipulated to gain tactical or strategic advantage.'"); <u>Westinghouse Elec. Corp. v. Republic of Philippines</u>, 951 F.2d 1414, 1425 (3d Cir. 1991) (noting that selective waiver does nothing to encourage attorney-client dialogue).

United States v. Pinson, 584 F.3d 972, 977 (10th Cir. 2009) (acknowledging, "The Supreme Court has recognized this rule for well over a century.").

Accordingly, a waiver with respect to a certain transaction or particular documents should not spill into unrelated collateral matters handled by the attorney. However, restricting a waiver demonstrated by a single communication to that single communication may not provide a complete view of the subject that is being discussed. Permitting a party to do so may be improperly permit them to use the privilege selctively as both sword and shield. See In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 24 (1st Cir. 2003) ("It is well accepted that waivers by implication can sometimes extend beyond the matter actually revealed. Such waivers are almost invariably premised on fairness concerns.")."

As a general rule, waiver of the privilege with regard to some communications waives the privilege as to all other communications relating to the "same subject matter." None can seriously argue that such a rule avoids the unfairness of selective disclosure. The term "same subject matter," however, is subject to different and variable interpretations and reliant upon the specific facts of each case. See In re Grand Jury Proceedings, 219 F.3d 175, 185 (2d Cir. 2000) ("Since fairness depends on context, we believe it is not prudent to formulate a per se rule in this area of the law.") (citing Upjohn Co. v. United States, 449 U.S. 383, 396 (1981) (opting for a case-by-case approach)).

In 2008, the adoption of FRE Rule 502 directly addressed the limits of partial waivers. Thus, Rule 502(a) entitled, "Disclosure Made in a Federal Proceeding or to a Federal Office or Agency; Scope of a Waiver" specifies:

When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if:

  Case 2:24-cr-20070-DDC    Document 107    Filed 05/30/25    Page 14 of 25

(i) the waiver is intentional;

(ii) the disclosed and undisclosed communications or information concern the same subject matter; and

(iii) they ought in fairness to be considered together.

Rule 502(a) thus replicates the "same subject matter" language and extends the waiver to any undisclosed communications that "ought in fairness to be considered together."  FRE 502(a)(2)-(3).  See, for example, Sky Angel U.S., LLC v. Discovery Commc'ns, LLC, 885 F.3d 271, 276 (4th Cir. 2018) (finding that corporation could not rely upon Rule 502(a) to gain access to memo of defendant, even though witnesses did testify upon contents of memo, because it failed to demonstrate applicability of privilege in first instance); Wi-LAN, Inc. v. Kilpatrick Townsend & Stockton LLP, 684 F.3d 1364, 1369 (Fed. Cir. 2012) (remanding contempt order against law firm for failure to produce discovery items for consideration of fairness element with Rule 502(a)); United States v. Davis, 636 F.2d 1028, 1044 (5th Cir. 1981) ("But disclosure of any significant portion of a confidential communication waives the privilege as to the whole" (citing 8 Wigmore, Evidence § 2327, at 638 (1961)).

Among the other limitless considerations that may influence the fairness of a partial disclosure are whether the disclosure was made voluntarily or by accident; whether the disclosure is being relied upon affirmatively, whom the disclosure would benefit; and whether the party defending a partial disclosure is engaging in improper gamesmanship.  On the fairness factor, a voluntary disclosure made to advance the client's position would typically permit inquiry into a wide scope of subject matter.

### III. <u>Argument</u>

The Boilermakers Union concedes that it made an express waiver over the September 2022 Memorandum.  Moreover, counsel for the Boilermakers Union concedes that it supplied the Government with multiple emails with its attorneys concerning the electronic surveillance allegations resulting in Count 47.  The remaining issue before the Court is where to draw the contours of the Boilermakers Union's waiver when considering a multitude of factors, and primarily fairness to the Government and the remaining six defendants in this prosecution.[2]

**A.  <u>The International Executive Council and Sitting International President of the Boilermakers Union Made a Full, Voluntary, and Unconditional Waiver of the Attorney-Client Privilege of the Organization Before a Federal Court</u>.**

In one of his first actions as new president, Warren FAIRLEY came forward voluntarily in an affidavit filed in federal court and declared: "A majority of the Executive Council agreed that we would waive any claim of privilege on behalf of the IBB**."**  At the time, preservation of attorney-client privilege was not at issue and nothing compelled FAIRLEY's declaration.  The Boilermakers Union took that position in June 2023 to demonstrate that President JONES was aware of the prevailing standards for spending union funds, to remove JONES from office for abuse of those standards, and to legitimize FAIRLEY's claim upon the presidency.  Whether that waiver of privilege was borne by good faith, or expedient political motives, FAIRLEY's statement is unequivocal and not subject to later retraction or limitation.  <u>Compare</u> <u>United States v. Ryans</u>, 903 F.2d 731, 741, n.13 (10th

---

[2] Kathy Stapp pleaded guilty to Count 1o f the Indictment on December 19, 2024.

Cir. 1990) (holding that even inadvertent disclosure of privileged materials may not be subject to retraction).[3]

It is true that FAIRLEY's declaration came simultaneously with the Boilermaker Union's release of the September 2022 Memorandum. The Executive Board's waiver of privilege, however, was in no way restricted to that particular document. His purpose in providing the memorandum, moreover, was clear: "a full airing of all issues" and a waiver of "any claim of privilege on behalf of the IBB."

Even if FAIRLEY's remarks were limited to the September 2022 Memorandum, the scope of the waiver created by its disclosure would not be restricted to its four corners. As set forth above, the extent of waiver of attorney-client privilege is determined on a subject-by-subject basis, not document-by-document. If a party were able to waive privilege over one document, but withhold other attorney-client communications on the same subject, the principle of fairness is necessarily defeated. See Burke v. Regalado, 935 F.3d 960, 1023 (10th Cir. 2019) ("Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter.") (citation omitted); United States v. Pinson, 584 F.3d 972, 977 (10th Cir. 2009) (same).

Finally, the purpose of the September 2022 Memorandum itself favors a broad scope of waiver. In April 2022, the grand jury issued its first subpoena in this matter requesting documentation concerning the standards and procedures the Boilermakers Union observed in

---

[3] Article 17.4.3 of the Boilermakers Union Constitution permits union members to attend Article 17 proceedings. See Attachment G, Article 17.4.3. Accordingly, the introduction of the September 2022 Memorandum in the Article 17 proceeding against JONES essentially constituted a separate waiver of privilege even without FAIRLEY's affidavit in the federal court proceeding.

making expenditures.  Blake and Uhlig attorneys drafted the September 2022 Memorandum in particular response to the April 2022 subpoena to address the "various expense and reporting issues" and the "subject of salary, benefits, and other expenses" permissible under law.  See Attachment A.  Where a party has waived privilege over legal advice obtained in response to specific requests in a criminal inquiry, it cannot later cage its waiver to the mere four corners of that document.

### B. **The Boilermakers Union's Release of Attorney-Client Emails Concerning Unauthorized Forensic Surveillance Supports the Propriety of a Broadly Drawn Waiver.**

In Summer 2024, while FAIRLEY was still president, the Boilermakers Union provided the grand jury with attorney-client emails concerning unauthorized surveillance tending to incriminate JONES, CREEDEN, Defendant McMANAMON.  The release of those emails demonstrates that the appropriate scope of the Boilermakers Union's waiver of privilege should transcend generalized memoranda and reach of the specific allegations within the Indictment.

Any further withholding of communications concerning unauthorized surveillance— or any of the other allegations within the Indictment—reveals the patent unfairness of the Boilermakers Union's current position. FAIRLEY released the September 2022 Memorandum and the surveillance emails which concerned potential offenses during JONES' tenure as president.  Now, the Boilermakers Union are withholding excerpts of meeting minutes and several memorandum created during FAIRLEY's tenure—including five which involved Attorney McClitis, the author of many of the surveillance emails.  See Attachment H, Privilege Log Production 15.

Basic principles of waiver do not permit a party to exercise selectivity in determining which privileged communications it will release and withhold.  As set forth above, fairness dictates that the scope of any waiver be determined by subject matter and not any other considerations.  The Boilermakers Union are essentially a third party, the victim actually, in this criminal prosecution.  Whether intentional or not, its shifting positions on the scope of its waiver carry the potential to place some parties at an unfair and undeserved disadvantage—especially in a criminal prosecution with six defendants, covering a dozen years, and three different union presidencies.  Fashioning an appropriately broad waiver will minimize the likelihood that exculpatory, as well as inculpatory, evidence is not improperly excluded from the record.

### C.  **The Boilermakers Union's Current Position on the Scope of Its Waiver is Contrary to Established Law.**

In several communications from March to May 2025, Attorney Morgan, current counsel for the Boilermakers Union, stated that release of the September 2022 Memorandum does not constitute either a general waiver of all privileged communications or a specific waiver of all documents from the Blake and Uhlig law firm which produced it.  This contention fails on two scores.  First, the Government has never argued that it was entitled to all legal work performed by Blake and Uhlig for the Boilermakers Union and such an assertion would be clearly untenable under prevailing law.  As noted below, the Government's requests were and are limited to those communications which address allegations which the grand jury returned in the Indictment.

Second, the scope of any waiver is determined by the subject matter of the waived communication, not upon which law firm or attorney produced it.  The Government and the defendants in this case may have no right to review all Blake and Uhlig communications,

regardless of subject.   Conversely, the Boilermakers Union should not be permitted to withhold communications concerning waived subjects based upon which law firm or lawyers were rendering the advice, whether by Blake and Uhlig or the other law firms which succeeded it.  Were it otherwise, a party could undo any waivers by simply switching law firms.

**D.  The Boilermakers Union Attempts to Assert Privilege Over Meeting Minutes and Other Documents are Contrary to Law and Untimely**

The Boilermakers Union's late attempt to assert privilege over some sixteen (16) separate meeting minutes of its International Executive Council fails on several grounds.

First, a union's meeting minutes as needed to verify its legally required annual reports are records required to be kept by the union pursuant to the Labor Management Reporting and Disclosure Act (29 U.S.C. § 431(a)(5)).  Those minutes, moreover, are legally required to be available to the members of the union.  See 29 U.S.C. §§ 431(c)).  Accordingly, the minutes of the Boilermakers Union are required to be publicly available to its 40,000 members and thus cannot be considered privileged under any circumstances.  See Kinslow v. Am. Postal Workers Union, Chicago Loc., 222 F.3d 269, 276 (7th Cir. 2000); Daniels v. Nat'l Post Off. Mail Handlers, 454 F. Supp. 336, 338 (E.D. Va. 1978).[4]

Second, consistent with those obligations, the Boilermakers Union has disseminated those meeting minutes to its members and delegates at its quinquennial conventions in the "Officers Reports."  Thus, even if those minutes were not required to be available to its members, the Boilermakers Union has long ago waived any arguable attorney-client privilege.

---

[4]  See 29 U.S.C. §§ 431(c) "Every labor organization required to submit a report under this subchapter shall make available the information required to be contained in such report to all of its members, and every such labor organization and its officers shall be under a duty . . . . to permit such member for just cause to examine any books, records, and accounts necessary to verify such report."

Third, the Boilermakers Union current assertion of privilege over those selected meeting minutes is grossly untimely. The grand jury subpoenaed those minutes beginning in April 2022, and in successive subpoenas which, in part, resulted in a fifty-seven (57) count indictment. At no time over the course of a two-year criminal investigation did the Boilermakers Union assert a comprehensive attorney-client privilege over its meeting minutes. Even if the Boilermakers Union now characterizes those disclosures as inadvertent, it has long ago waived any such claim of privilege by its own actions. See United States v. Ryans, 903 F.2d 731, 741, n. 13 (10th Cir. 1990) (collecting authority).[5]

By analogy, the Federal Civil Rules of Procedure permits a reassertion of privilege over inadvertently disclosed materials provided: 1) the holder of the privilege or protection took reasonable steps to prevent disclosure; and 2) the holder promptly took reasonable steps to rectify the error. FRCP 26 (b)(5)(B). In this case, the Boilermakers Union neither took reasonable steps to prevent advertent disclosure of potentially privileged materials in its meeting minutes, nor promptly attempted to rectify any errors in disclosure. Instead, the Boilermakers Union failed to challenge any of the Government's subpoenas requesting meeting minutes and provided those minutes to the grand jury where they were relied upon to return a substantial indictment charging seven (7) defendants. Now, after the nine-month pendency of that Indictment, the Boilermakers Union, as a non-party to that prosecution, cannot timely or reasonably assert any privilege over them.

Similarly, the Boilermakers Union's recent assertion of privilege over the invoices of its former counsel, David Elbaor, is equally meritless. The season for challenging production

---

[5] Compare Fed. R. Evid. 502 (specifying that inadvertent disclosure may constitute waiver unless holder took reasonable steps to prevent disclosure and promptly took reasonable steps to rectify error).

of those documents based upon privilege has long passed and the union fails to present any circumstances which would overcome the general rule that attorney's bills and invoices are not privileged. In re Grand Jury Subpoenas, 906 F.2d 1485, 1492 (10th Cir. 1990) ("Information regarding the fee arrangement is not normally part of the professional consultation and therefore it is not privileged even if it would incriminate the client in wrongdoing. In other words, while payment of a fee to an attorney is necessary to obtain legal advice, disclosure of the fee arrangement does not inhibit the normal communications necessary for the attorney to act effectively in representing the client.") (citation omitted).

The Boilermakers Union's tardy assertions of privilege—especially its request to clawback meeting minutes produced years earlier which have been already provided in discovery—begs a reiteration of basic principles. First, the Boilermakers Union constitutes a third party in this criminal prosecution where permission to intervene to assert privilege remains within the discretionary authority of the Court. See Security Ins. Co. of Hartford v. Schipporeit, Inc., 69 F.3d 1377, 1381 (7th Cir.1995); Chen Chi Wang v. United States, 757 F.2d 1000, 1004 (9th Cir.1985). When considering whether to grant a motion for permissive intervention, moreover, FCRP Rule 24(b)(3) directs the court to "consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." In this instance, the Boilermakers Union still undisclosed position on scope of waiver and request for open-ended privilege review of emails and electronic devices promise untold delay in this case.

Second, it is the burden of the Boilermakers Union as the party asserting privilege to establish all its elements and its applicability herein to, in effect, shield the decisions of its International Executive Council from scrutiny. The Government is under no obligation to

reestablish the public's interest in a full presentation of relevant evidence and, certainly, the defendants should not be brought to bear over their constitutional rights to form a defense from documents already produced by the Boilermakers Union and within their possession through discovery.

**E.    Pursuant to Established Principles, the Court Should Draw A Clearly Delineated Scope of the Boilermakers Union's Waiver of Privilege at This Time.**

A declaratory judgement from the Court concerning the scope of any waiver of attorney-client by the Boilermakers Union is appropriate at this time.  Discovery materials within the possession of the Government have been produced and all parties hold an interest in examining any communications which may be eventually determined to be admissible. Postponing any privilege matters to, if and when, they arise closer to trial will deprive the parties from access to waived communications in preparation of their dispositive motions by August 1, 2025, and formulation of trial strategy thereafter.  The content of potentially privileged communications released as a result of an affirmatively drawn waiver from the Court may influence whether the defendants choose to consider a plea or proceed to trial or, in the extreme, whether the Government should dismiss some charges.  At the very least, settling the scope issue at this moment will avoid the unspecified delays Attorney Morgan envisions in order to conduct a filter review of the potentially privileged emails, much less additional time-consuming reviews should one or more of the six defendants choose to assert an advice-of-counsel defense.

In addition, the parties are currently discussing how to replicate and distribute materials captured on dozens of electronic devices currently in the possession of the Boilermakers Union.  Without a clear delineation of the scope of waiver from the Court, those materials may have to be filtered for attorney-client privilege—a substantial undertaking

where some of the six remaining defendants may be entitled to privileged communications, but other defendants and the Government may not.  As with the emails, those materials may have to be filtered yet again if any court order addressing the scope of the Boilermakers Union's subsequent waiver of privilege follows their original production and distribution to the parties.

The Government maintains that the declaration in the affidavit by filed then-president FAIRLEY on June 16, 2023, contains an unconditional waiver of the entirety of its attorney-client privilege over the subject matter of the Indictment.  Based upon that statement, the Government argues that no attorney-client privilege remains as to the subject matter of the Indictment.  However, an affirmative order delineating the specific contours of the waiver using the language below will provide better direction to the parties.  Accordingly, the Government requests that the Court enter an order defining the waiver of the Boilermakers Union's attorney-client privilege to:

    1)  any communications between Boilermakers Union officers or employees and any of its attorneys concerning the standards for expenditure of union funds under the Boilermakers Union Constitution, by-laws, and policies, and federal law; and

    2)  any communications between Boilermakers Union officers or employees and any of its attorneys concerning the subject of any the Indictment allegations, regardless of when the communications were made.

## Conclusion

WHEREFORE, the Government respectfully requests that the Court grant its motion and enter a declaratory judgment defining the scope of the Boilermakers Union's waiver of attorney-client privilege as requested.

    Respectfully submitted,

    DUSTON J. SLINKARD

ACTING UNITED STATES ATTORNEY

By: */s/Faiza H. Alhambra*
FAIZA H. ALHAMBRA
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
913-551-6904
913-551-6541 (fax)
Faiza.Alhambra@usdoj.gov
Kan. S. Ct. No. 24525

By: */s/ Jabari B. Wamble*
JABARI WAMBLE
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
913-551-6730
913-551-6541 (fax)
Jabari.wamble@usddoj.gov
Kan. S. Ct. No. 22730

By: */s/ Vincent Falvo*
VINCENT FALVO
Trial Attorney
Violent Crime and Racketeering Section
United States Department of Justice
1301 New York Avenue, NW, Room 753
Washington, D.C. 20530
(202) 353-9384
vincent.falvo@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on May 30, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

*/s/ Faiza H. Alhambra*
Faiza H. Alhambra
Assistant United States Attorney