



Attorney-Client Privileged
and Confidential

## MEMORANDUM

File: 0053.6416

**TO:** Tim Simmons, AAIP/ED-CSO, Kathy Stapp, AAIST/D-HR&BP
**FROM:** Michael J. Stapp, GC; Jason McClitis, AGC
**DATE:** September 20, 2022
**RE:** **UNION PAYMENTS TO OFFICERS AND EMPLOYEES**

Directors Simmons and Stapp:

A version of this memorandum was originally prepared to send to President Jones. However, the memorandum was not sent to President Jones. The purpose of the original memorandum was mooted by intervening factors.

I believe this memorandum should aid you as you decide on recommendations to President Jones regarding the various expense reporting and reimbursement issues discussed on September 13, 2022. Please consult with me and/or AGC McClitis regarding specific recommendations before you submit those to President Jones.

This memorandum addresses the subject of the salary, benefits, and other expenses that a union is permitted to pay its officers and employees under the LMRDA and other applicable laws. Please note that while the Title II LMRDA reporting requirements are also briefly addressed, a full discussion of those requirements is beyond the scope of this memorandum.

### EXECUTIVE SUMMARY

Courts extend some deference to a union's interpretation of its own constitution, using a "reasonableness" standard.

A union's payments to its officers and employees, including salaries, benefits, and expenses, is likely limited by what is deemed reasonable under its constitution, as well as what is reasonable based on the individual representative's fiduciary duties. There does not appear to be a distinction between officers and employees for this purpose.

1

Attorney-Client Privileged
Confidential

Authorization of union payments by delegates at an International Convention is a defense to § 501 claims, although it may not completely block all such claims.

Not only can the conversion of union funds or property be considered a violation of the LMRDA, but it can also be considered of a violation of criminal wire and mail fraud laws.

If the IEC were to adopt rules which provide a detailed explanation of what and how reasonable expenses will be reimbursed, the courts will likely defer to IBB. Those rules must also conform to DOL and IRS record keeping requirements.

Without such rules the officers and staff are left to struggle with the broader language of the Constitution and their belief as to what "past practice" has been. This can result in honest mistakes and conflicting interpretations. The courts are much less likely to defer to IBB, if it can be shown that there are conflicting practices among the IBB officers and staff concerning expense reimbursements.

## I.    APPLICABLE AUTHORITY

### A.    The LMRDA Imposes Fiduciary Obligations On Union Representatives And Creates Criminal Penalties For Certain Misconduct.

Under the LMRDA, officers and representatives of labor organizations have certain fiduciary responsibilities.[1]

Importantly, 29 U.S.C. § 501(a) requires that union representatives hold the money and property of a union "solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder." This imparts a duty on union representatives, in connection with any financial transactions involving union funds, to act at all times as a fiduciary of the organization.[2]

The statute further provides that members may sue union representatives for violations of paragraph (a) in order "to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization."[3]

The provisions of § 501 paragraphs (a) and (b) apply only to "officers, agents, shop stewards, and other representatives of a labor organization." Further interpretation of this phrase is provided by 29 U.S.C. § 402(q), which holds that such a group "includes elected officials and key administrative personnel, whether elected or appointed (such as business agents, heads of departments or major units, and organizers who exercise substantial independent authority), but does not include salaried nonsupervisory professional staff, stenographic, and service personnel."

---

[1] 29 U.S.C. § 501.
[2] 29 U.S.C. § 501(a).
[3] 29 U.S.C. § 501(b).

2

Attorney-Client Privileged
Confidential

As a result, the fiduciary duties imparted by the first two paragraphs of § 501 may not extend to certain union employees if they are not supervisory or considered to be "key" personnel within the organization.

Finally, 29 U.S.C. § 501(c) provides criminal penalties for violations of the statute, by anyone who willfully converts to their or another person's own use money, funds, or other assets of a labor organization in which that person is directly or indirectly employed. Anyone who commits such a violation **shall** be fined not more than $10,000 and/or imprisoned not more than five years. Thus, the statute requires all individuals, including outsiders, to ensure that they are spending union funds **only** for legitimate union purposes.

It should be noted that a 'willful' violation has been interpreted to mean that an individual "'was sufficiently aware of the facts to know that he acted wrongfully and in contravention of the trust placed in him by the union and its members.'"[4]

## B.    The C.F.R. Affords A Measure Of Deference To A Union's Interpretation Of Its Own Constitution

Under 29 C.F.R. § 452.3, "[t]he interpretation consistently placed on a union's constitution by the responsible union official or governing body will be accepted unless the interpretation is clearly unreasonable." Thus, the C.F.R. confirms what many courts have held – that considerable deference is extended to a union's interpretation of its own constitution.

## C.    The IBB Constitution Provides The Applicable Authority Regarding Officer And Employee Salaries And Payments.

The stated purposes of the IBB are contained in Article 1.2 of the Constitution. Importantly, Article 1.2 notes that "the participation of this International Brotherhood, individually and with other organizations, in the pursuit and attainment of the objectives set forth herein are for the sole benefit of the organization and its members." (Emphasis added).

The International President of the IBB is the principal executive and administrative officer of IBB and shall enforce its laws according to the Constitution and policies set down by the Constitution and IEC. (Article 7.1.1, p. 23, ln. 1-4). While not in Convention, the IEC is vested with executive and judicial authority (Article 1.5).

Under Article 5.2 the IEC "shall have the power to supervise all the business and financial affairs" of IBB "and to authorize all expenditures deemed necessary to effectuate or accomplish the objectives" of IBB. (Article 5.2, p. 17, ln. 13-18). The President and IEC also have the authority to implement or modify benefit plans for officers, staff and employees. (Article 5.2, p. 18, ln. 24-

---

[4] *United States v. Long*, 952 F.2d 1520, 1524 (8th Cir. 1991) (quoting *United States v. Welch*, 728 F.2d 1113, 1116 (8th Cir.1984)).

3

Attorney-Client-Privileged
Confidential

28). Likewise, the IEC has the authority to continue or modify policies concerning the expenditure of IBB funds by officers and employees. (Article 5.2, p. 18, ln. 28-34)

Finally, the Executive Council has the authority to establish rules and regulations, where not spelled out in the Constitution and not inconsistent with the Constitution. (Article 5.2, p. 13, ln. 50-58).

There are several sections of the IBB Constitution which address the reimbursement of reasonable and necessary expenses incurred for a union purpose.

For example, Article 7.4, p. 4, lists several expenses for which an International Representative may be reimbursed. This includes "food, and maintenance allowances and expenses in the amount of … $75" when out of town. It is my understanding that this has been interpreted to mean the International Representative is paid an allowance of seventy-five dollars ($75) a day, which includes their meals.

One of the items which we discussed for which I believe there needs clarification is whether, when an International Representative is authorized to buy a meal for theirself and others for a business purpose, the International Representative's meal is being authorized in addition to the $75 per day or whether the International Representative must deduct their portion of the meal from the expense.

While less specific, there are also Constitutional provisions which provide for reimbursement of the expenses of International Officers.

Article 7.4 provides the International President shall receive his/her salary "plus allowances and expenses." Article 8.2 provides that International Vice-Presidents shall receive their salary "plus allowances and expenses." Article 8.2 goes on to state the IEC has the authority to modify and/or replace such allowances or expenses. Article 9.4 provides that IST shall receive his salary "plus allowances and expenses." The same issue concerning meals and perdiem would arise if and when the officers are on per diem

4

Attorney-Client Privileged
Confidential

## II.    CONSTITUTIONAL INTERPRETATION

### A.    Courts Often Defer To Union Interpretations Of Their Own Constitutions.

Courts have long expressed an unwillingness to interfere with or regulate internal union affairs.[5]
Additionally, it is well established that courts should defer to a union's interpretation of its
constitution unless the interpretation is in some way "unreasonable."[6]

There appear to be a number of ways in which Courts have determined the reasonableness of an
interpretation, although the result is generally the same. For example, the Eleventh Circuit has
stated that a court must accept a union's interpretation of its constitution "if it is fair and
reasonable," which "turns on whether it is a fair interpretation of the words and provisions of the
Constitution."[7]

Likewise, the Eighth Circuit has stated that "[a]bsent bad faith, we will defer to the union's
interpretation of its own constitution, provided that interpretation is reasonable and not contrary to
the constitution's express language."[8] Further still, "the union constitution 'is a flexible instrument
that ... entrusts to the president plenary authority to do whatever is necessary to protect the interests
of the membership.'"[9]

The Tenth and Seventh Circuits similarly give great deference to union constitutional
interpretations, stating that a court "must be able to call the interpretation unreasonable, perhaps
even patently unreasonable, before we can set it aside."[10] For example, the Seventh Circuit
deferred to a union's constitutional interpretation in deciding whether, when committee chairs of
an international union departed from constitutional procedure regarding ballot measures, such a
departure was reasonable under the constitution.[11]

---

[5] *See Int'l Bhd. of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers & Helpers, AFL-CIO v. Hardeman*, 401 U.S.
233, 244–45 (1971) ("[I]f a union may discipline its members for offenses not proscribed by written rules at all, it is
surely a futile exercise for a court to construe the written rules in order to determine whether particular conduct falls
within or without their scope."); *See also N.L.R.B. v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 184 (1967) ("It is
significant that Congress expressly disclaimed in this connection any intention to interfere with union self-government
or to regulate a union's internal affairs.").

[6] *Vestal v. Hoffa*, 451 F.2d 706, 709 (6th Cir. 1971) ("Courts are reluctant to substitute their judgment for that of union
officials in the interpretation of the union's constitution, and will interfere only where the official's interpretation is
not fair or reasonable.").

[7] *Loc. 317, Nat. Post Off. Mail Handlers, Watchmen, Messengers & Grp. Leaders Div. of Laborers' Etc. v. Nat'l Post
Off. Mail Handlers, Etc.*, 696 F.2d 1300, 1302 (11th Cir. 1983).

[8] *Allen v. United Transp. Union*, 964 F.2d 818, 821 (8th Cir. 1992).

[9] *Id.* (quoting *Famulare v. United Transp. Union Int'l*, 639 F.Supp. 965, 969 (S.D.N.Y.1986)).

[10] *James v. Int'l Bhd. of Locomotive Engineers*, 302 F.3d 1139, 1146 (10th Cir. 2002) (quoting *Fulk v. United Transp.
Union*, 160 F.3d 405, 408 (7th Cir.1998)).

[11] The Court noted that the union offered several reasons for its departure from procedure, and that there was no
evidence "these departures were undertaken in a way that is arbitrary, discriminatory, or in bad faith." *Id.* at 1149-50.
Thus, the Court held that "[i]n light of the broad scale of the consolidation undertaken here and the ability of committee
chairs to make their views known, we believe these departures from constitutional procedure are within the bounds of
reasonableness as constrained by the deference we must give to a union's interpretation of its constitution and union
conduct with regard to its own internal affairs." *Id.* at 1150.

5

Attorney-Client Privileged
Confidential

As the court in *Morrissey v. Curran* noted, "[t]his sensitivity to the special labor context in [Section] 501 is reflected in one of the principles Congress expressly followed in drafting the overall legislative scheme: minimum interference in the internal affairs of unions."[12] Therefore, in most instances Courts will refrain from interfering with union affairs and permit union decisions based on their own constitutional interpretation to stand, barring some sort of showing of unreasonableness.

## B.    The IBB Constitution Provides Fairly Broad Authorization Regarding Salaries And Expenses.

The IBB Constitution confers a substantial measure of authority to the President and Executive Council, as well as the IBB delegates while assembled in Convention.

With regard to interpretation of the Constitution, Article 7.2 permits the President to decide all such questions, and such decisions are binding unless reversed or modified by the Executive Council on appeal, as provided in Article 5.7. The Convention also has the power to approve or reverse such decisions pursuant to Article 1.4.

Likewise, the Executive Council has the power to supervise the IBB's business and financial affairs and authorize expenditures necessary to benefit the IBB or to achieve its objectives in Article 5.2. As there is no language constricting what types of expenditures are considered to be necessary, this language provides latitude with regard to interpreting what is considered necessary or beneficial to the IBB, but at the same time constrained by what is reasonable and legitimate.

Thus, in conjunction with the deference courts traditionally extend to union constitutional interpretations, the President and Executive Council likely have very broad authority to make determinations about reasonable salaries, benefits, and legitimate expenses paid to IBB officers and employees.

To date though, IBB has not exercised its authority to enact a comprehensive set of rules governing reimbursement of reasonable and legitimate business purpose expenses. We believe that if the President and IEC were to adopt such rules, the courts would most likely defer to IBB. However, such rules must limit reimbursed expenses to those that are reasonable and for a legitimate purpose. Further, the IBB rules must follow DOL record keeping requirements, such as receipts, names and business purpose.

---

[12] *Morrissey v. Curran*, 650 F.2d 1267, 1272 (2d Cir. 1981).

0053.6416 – Final – September 20, 2022

Attorney-Client Privileged
Confidential

## III.    UNION PAYMENTS TO OFFICERS AND EMPLOYEES

### A.    A Union's Payments To Its Officers And Employees Is Likely Governed By A Reasonableness Standard.

While there is little authority on the matter, it appears that the primary limits to the salaries, expenses, and benefits that a union may pay to its officers and employees are defined by what is reasonable under the union's constitution.

The D.C. Circuit in *Noble v. Sombrotto* acknowledged that unions have discretion in compensating officers and employees.[13] In the case, the court considered an appeal from the D.C. District Court in which the plaintiff, a member of the National Association of Letter Carriers, brought suit against the union president and seven other officers.[14]

The plaintiff alleged that the officers had violated their duties under Section 501(a) by (1) receiving reimbursements for their expenses incurred during union business within Washington, D.C., (2) receiving reimbursements of FICA payroll taxes, and (3) receiving "per diem" allowances during National Convention meetings.[15] The district court dismissed the plaintiff's allegations in the entirety.[16]

On appeal, the D.C. Circuit held that, as to the reimbursement of officers for expenses incurred within Washington, D.C., the district court erred in dismissing such allegations since the vast majority of allowances paid to officers during the pertinent period were not supported by expense receipts.[17] However, the court affirmed the district court's ruling as to the other allegations, finding that reimbursement of FICA payroll taxes and the per diem payments were specifically authorized and not clearly contrary to the union's constitution.[18]

Notably, the court stated that "[w]here, as here, the union constitution explicitly incorporates policy concerns into the Board's grant of authority by directing the Board to establish benefits as 'required to attract and retain competent personnel,' a given benefit's wisdom as a policy matter is germane to the Board's constitutional authority to authorize it."[19] Thus, the Court recognized that unions must have the ability to offer employees competitive compensation for the benefit of the union as a whole.

---

[13] *Noble v. Sombrotto*, 525 F.3d 1230, 1238 (D.C. Cir. 2008).
[14] *Id.* at 1232.
[15] *Id.* at 1235-38.
[16] *Id.* at 1232.
[17] *Id.* at 1236. The Court's finding of a potential violation of the union constitution for failure to keep itemized receipts is addressed more fully in a separate memo by our office regarding union officer expenses.
[18] *Id.* at 1237-39.
[19] *Id.* at 1238.

7

Attorney-Client Privileged
Confidential

Although the IBB Constitution does not contain the exact language referenced in *Sombrotto*, the IBB likely has the authority to provide similarly competitive compensation.[20] For example, Article 5.2 vests the Executive Council with the power to "authorize all expenditures deemed necessary to effectuate or accomplish the objectives of this International union, as set forth in Article 1.2 and other applicable provisions of the union's Constitution, or for its benefit." As Article 1.2 provides that the objectives of the IBB "are for the sole benefit of the organization and its members," which includes IBB employees, it is likely that the IBB has the ability to adopt a compensation structure intended to provide such a benefit.

Article 1.2 also states that one of the purposes of the IBB is "to protect and preserve the union as an institution." It is very likely that providing a level of compensation sufficient to ensure the retention of competent personnel and officers is a reasonable means of protecting and preserving the union.

Furthermore, attracting particularly talented employees and officials will serve to benefit the entire membership. Thus, it is likely that a compensation structure adopted pursuant to this purpose may be considered reasonably authorized by the Constitution.

Article 1.2 additionally provides that one of the purposes of the IBB is "to provide educational advancement and training for officers, employees, and members." It is certainly reasonable to conclude that the IBB is advancing its stated purpose by expending funds on events or travel in order to provide educational opportunities for its for its officers, employees, and members.

Therefore, as with officer salaries, it is also likely that IBB disbursements related to educational opportunities of value to IBB are reasonably authorized by the Constitution.

Payments to union officers and employees likely must also be considered "reasonable" in order to withstand challenges under § 501. The Second Circuit in *Morrissey v. Curran* "adopt[ed] the view, consistent with the thrust of [Section] 501, that where a union officer personally benefits from union funds, a court in a [Section] 501(b) suit may determine whether the payment, notwithstanding its authorization, is so manifestly unreasonable as to evidence a breach of the fiduciary obligation imposed by [Section] 501(a)."[21]

In *Morrissey*, the plaintiffs were members of the National Maritime Union who brought suit against several officers and an employee of the union, claiming that they had breached their fiduciary duties by receiving improper payments and excessive compensation.[22] In considering the claims on appeal, the court cautioned:

> [T]he court is not at liberty to revise any compensation arrangements more generous than the court might have established. Section 501 does not convert judges

---

[20] However, salaries of the Officers and International Representatives is specifically limited by the IBB Constitution. See Articles 7.3, 7.4, 8.2 and 9.4.  There is no mention in the IBB Constitution regarding other positions.
[21] *Morrissey v. Curran*, 650 F.2d 1267, 1274 (2d Cir. 1981).
[22] *Id.* at 1271.

8

Attorney-Client Privileged
Confidential

into paymasters for union officers. The fiduciary standards for union officers impose liability upon them when they approve their receipt of excessive benefits, significantly above a fair range of reasonableness.[23]

The court also noted that "as long as a union's actions involve a reasonable interpretation of a contract, [Section] 501 does not authorize a court to substitute its interpretation for that of the union, nor to revise the resulting payment unless the payment is grossly excessive."[24]

Thus, the court affirmed the district court's decision that the union president's salary was knowingly authorized by the membership, and that his receipt of three years' salary as severance pay was not excessive.[25] Additionally, the court reversed the district court's finding that the president's pension benefits were unreasonable, and that a $100 per week fixed expense allowance for officers violated the fiduciary obligation of Section 501.[26]

However, the court found that several forms of compensation received by the officers were not authorized by the union, including tax refund payments to the president above his authorized net salary, pay received in lieu of vacation for years in which the officers had actually taken vacation, and travel expenses for the president between his home in Florida and the union's headquarters in New York that were unrelated to union business.[27] The court also agreed with the district court that an accounting was required to determine the business nature of trips to Europe by union officers and their wives using union funds.[28]

Therefore, while a union's ability to compensate its officers and employees is not unlimited, courts will typically defer to the union's decision if it is reasonably authorized by the constitution.[29] Furthermore, it may be necessary to prove the payment was "manifestly unreasonable" or "grossly excessive", in order to demonstrate that such a payment violated the fiduciary requirements of § 501.

Given these considerations, as well as the IBB's broad language authorizing payment of necessary expenses and salaries, it is likely that the IBB has some discretion in determining the compensation and reimbursement of its officers and employees.

---

[23] *Id.* at 1275.

[24] *Id.* at 1278.

[25] *Id.* at 1275-76.

[26] *Id.* at 1278, 1284.

[27] *Id.*

[28] *Id.* at 1284-85.

[29] *See Puma v. Brandenburg*, 324 F. Supp. 536, 544–45 (S.D.N.Y. 1971) ("Union officers will not be guilty of breach of trust under this section [501] when their expenditures are within the authority conferred upon them either by the constitution and by-laws, or by a resolution of the executive body, convention or other appropriate governing body— including a general meeting of the members— not in conflict with the constitution and by-laws.").

9

Attorney-Client Privileged
Confidential

## B.    The Kavanaugh Partial Concurrence And Dissent In *Noble v. Sombrotto*.

In *Noble v. Sombrotto*, then-Circuit Judge Kavanaugh, who is now a Supreme Court Justice, wrote an opinion partially concurring and dissenting from the majority opinion, in which he stated that he would reject the entirety of the plaintiff's Section 501 claims.[30] The Kavanaugh opinion expressed sentiments favorable to the ability of a union to interpret and manage its own affairs, and provided useful insight into the reasoning of an individual who is now a member of the Nation's highest court.

Kavanaugh reiterated that courts owe "considerable deference" to officers' constitutional interpretations, and the deference extended is even greater when the union convention has approved the officers' interpretation, as such approval "'undermines a finding that the [officers'] interpretation was unreasonable and made in bad faith.'"[31]

Kavanaugh noted that the union convention had on two occasions approved the practices being challenged by the plaintiff.[32] Thus, Kavanaugh pointed out that "[b]ecause the union approved its officers' interpretation of the union constitution, the federal courts have limited authority under our precedents to upset that interpretation, at least absent an unusual or egregious set of facts."[33]

Therefore, even though the plaintiff presented a plausible interpretation of the constitutional language regarding expenses and benefits, "the officers' interpretation of the constitutional language is not unreasonable and is nowhere near the kind of egregious interpretation that would warrant a judicial override of the union's overwhelming approval of the officers' interpretation."[34]

The *Sombrotto* case was thereafter remanded to the district court, which followed Kavanaugh's reasoning in finding that the union officers' actions of failing to submit receipts for all of their expenses had not resulted in a breach of their § 501 fiduciary duties.[35] The Court of Appeals later affirmed the district court's decision on remand. In doing so, the Court of Appeals cited Kavanaugh's previous partial concurrence and dissent, stating that the plaintiff "has given us no reason to second guess the Union's own interpretation thereof."[36]

---

[30] *Sombrotto*, 525 F.3d at 1242. Kavanaugh's only dissent from the majority opinion concerned the court's remand to the district court for consideration of the propriety of expense reimbursements to officers for union business conducted within Washington, D.C.

[31] *Id*. (quoting *Monzillo v. Biller*, 735 F.2d 1456, 1458 (D.C.Cir.1984)).

[32] *Id*. at 1243.

[33] *Id*.

[34] *Id*. at 1244.

[35] *Noble v. Sombrotto*, 84 F. Supp. 3d 11, 30 (D.D.C. 2015) ("[T]he existence of a significant record of receipts describing the types of union-related expenses contemplated by the Resolution supports testimony that $500 per month was a reasonable amount that a resident officer could expect to have to spend in order to perform the job."). However, while not addressed by the Court, the failure to submit receipts likely would be considered a breach of the reporting requirements of LMRDA, as set out in 29 U.S.C. § 431(b) and 29 C.F.R. § 403.2.

[36] *Noble v. Dunn*, 895 F.3d 807, 811 (D.C. Cir. 2018) (citing *Sombrotto*, 525 F.3d at 1242).

10

Attorney-Client Privileged
Confidential

### C.  Authorization Of Union Salaries And Expenses.

One of the primary defenses to § 501 claims is authorization by the union convention. As Kavanaugh pointed out in his *Sombrotto* opinion, this high measure of deference afforded to actions authorized by union membership can be analogized to the defense in shareholder derivative actions of ratification by shareholders of potentially self-dealing transactions involving directors.[37] Thus, in both situations the authorization provides an implicit inference that the action by the officials/directors was not unreasonable or harmful, otherwise it would not have been approved.[38]

One example of this can be seen in a case in which the Seventh Circuit found that the adoption of a pension plan which would benefit some of the delegates at a union's international convention did not violate the LMRDA.[39] The Court stated that "where, as here, the complaining party did not reasonably raise and pursue the alleged procedural irregularity within the parliamentary structure of the union, it should not find an alternate forum in the federal courts when it is called upon to honor an obligation to which it has already acquiesced by its conduct."[40]

Thus, it appears that when convention delegates fail to raise any issues regarding actions taken by an international union through the proper union channels, they may waive their rights to assert a claim for violations of the LMRDA.[41]  It is unclear whether this applies only to actions which delegates have been affirmatively made aware of through a vote or otherwise.  One would think that delegates could only approve that which they are aware of and delegates silence on an unknown practice does not denote approval of the practice.

On the other hand, authorization is not a total defense to claims under § 501. While the Second Circuit noted in the *Morrissey* case that Congress contemplated minimal judicial intrusion in union affairs, the court did not agree "that Congress thereby intended to establish authorization as a complete defense to [Section] 501 claims. For that would permit a union constitution to vest limitless spending power in union officers and, even where membership vote is required, leave dissenting members powerless to halt abusive practices."[42]

---

[37] *Sombrotto*, 525 F.3d at 1242.

[38] *See id.* at 1243 ("In this case, the officers' interpretation of the constitution was at least reasonable—which no doubt is why the union twice overwhelmingly approved their interpretation.").

[39] *Trustees of Operative Plasterers' & Cement Masons' Loc. Union Officers & Emps. Pension Fund v. Journeymen Plasterers' Protective & Benev. Soc., Loc. Union No. 5.*, 794 F.2d 1217, 1221 (7th Cir. 1986).

[40] *Id.*

[41] While the Court in *Trustees of Operative Plasterers' & Cement Masons' Loc. Union Officers & Emps. Pension Fund* found that the plaintiff waived its right to challenge a convention vote under § 501 because it did not challenge the vote within the internal structure of the union, this holding was based on a theory of laches rather than an exhaustion of remedies. It has been held that although 29 U.S.C. § 411(a)(4) states that a union may require a member to exhaust reasonable remedies (not exceeding a four-month lapse of time) before instituting a court action, such a proviso is merely a policy statement that allows courts, in their discretion, to stay their hands for four months while the aggrieved person seeks internal union relief. *See N.L.R.B. v. Indus. Union of Marine & Shipbuilding Workers of Am., AFL-CIO, Loc. 22*, 391 U.S. 418, 426 (1968); *See also Pawlak v. Greenawalt*, 628 F.2d 826, 831 (3d Cir. 1980) ("The exhaustion requirement is not absolute; rather, its application is left to the discretion of the district court, based upon the facts of the particular case.").

[42] *Morrissey*, 650 F.2d at 1272.

11

Attorney-Client Privileged
Confidential

Thus, authorization by a union's membership will not always ensure that certain actions will withstand judicial scrutiny.

### D.    Union Officers, Union Employees, & Outsiders

There does not appear to be authority regarding a distinction between union officers and union employees and staff members with regard to the payment of salaries and expenses. However, there does appear to be a distinction with regard to the fiduciary duties imposed by § 501. As previously noted, paragraphs (a) and (b) of § 501 apply to "officers, agents, shop stewards, and other representatives of a labor organization," which is explained by 29 U.S.C. § 402(q) to exclude certain employees such as nonsupervisory professional staff and stenographic or service personnel. The § 501 fiduciary duty also does not extend to delegates representing members and local unions at an international convention, as "[t]he primary target of the Act's fiduciary duty provision (section 501) was not the union convention but rather the union official charged with the management of the memberships' assets."[43]

Thus, while there likely is not a difference between officers and staff members for the purpose of determining what a union may pay its employees, officers receiving unauthorized or improper payments may be held responsible under the fiduciary provisions of § 501, while delegates and employees who do not fall under the § 402(q) definition may not. However, union employees, as well as outsiders, may still be liable under § 501(c), as that paragraph extends criminal penalties to any person who unlawfully converts union assets for personal use.

### E.    Reporting Requirements

Although a full discussion of the LMRDA reporting requirements is beyond the scope of this memorandum, it should be noted that there are potentially severe penalties for failure to properly report the compensation of union officers and employees. Under 29 U.S.C. § 431(b)(3), a labor organization must file an annual report signed by its president and treasurer containing "salary, allowances, and other direct or indirect disbursements (including reimbursed expenses) to each officer and also to each employee who, during such fiscal year, received more than $10,000 in the aggregate from such labor organization and any other labor organization affiliated with it."

The DOL has established Form LM-2 for the reporting of this information.[44] The LMRDA provides that willful violations of the reporting requirements, false statements or representations, and false entries are punishable by a fine of not more than $10,000, imprisonment of not more than one year, or both.[45]

---

[43] *Trustees of Operative Plasterers' & Cement Masons' Loc. Union Officers & Emps. Pension Fund*, 794 F.2d at 1221 (citing Cox, *Internal Affairs of Labor Unions Under the Labor Reform Act of 1959*, 58 MICH. L. REV. 819 (1960)).
[44] 29 C.F.R. § 403.3.
[45] 29 U.S.C. § 439.

Attorney-Client Privileged
Confidential

Any officer who falsely reports information contained in the Form LM-2 may also be subject to
the criminal penalties for false reporting and perjury imposed by 18 U.S.C. § 1001 and 28 U.S.C.
§ 1746. Additionally, the Secretary is authorized to bring a civil suit for violations of the LMRDA
"for such relief (including injunctions) as may be appropriate.[46]

## IV.    FEDERAL FRAUD ACTIONS

In addition to the criminal and civil actions discussed above, an individual may also be subject to
federal charges of mail fraud and/or wire fraud as a result of improper use of union funds and
resources. Thus, as demonstrated below, defendants in such actions may be charged with, and
convicted of, multiple offenses, increasing the severity of the charges and resulting punishment.

### A.    Elements Of Fraud

The federal mail and wire fraud statutes are very similar, differing only in the means used to
effectuate the fraudulent scheme.[47]

With respect to mail fraud, the elements are "(1) having devised or intending to devise a scheme
to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of
executing, or attempting to execute, the scheme (or specified fraudulent acts)."[48] Use of the mail
need only be "incident to an essential part of the scheme, or a step in the plot."[49]

Similarly, the crime of wire fraud consists of "a scheme to defraud, use of the wires in furtherance
of the scheme, and the specific intent to defraud."[50]

### B.    Punishable Acts

There are numerous instances of the federal government's use of the federal wire and bank fraud
statutes to prosecute individuals for misuse of union resources.

In one illustrative example, a union official and his sister, an administrative assistant for the union,
were charged with mail fraud, among other crimes, due to repeated abuse of their position within

---

[46] 29 U.S.C. § 440.

[47] 18 U.S.C. § 1341, 1343; *see also Neder v. United States*, 527 U.S. 1, 20 (1999) ("Although the mail fraud and wire
fraud statutes contain different jurisdictional elements (§ 1341 requires use of the mails while § 1343 requires use of
interstate wire facilities), they both prohibit, in pertinent part, 'any scheme or artifice to defraud' or to obtain money
or property 'by means of false or fraudulent pretenses, representations, or promises.'").

[48] *Schmuck v. United States*, 489 U.S. 705, 721 (1989).

[49] *Id.* at 711; *accord United States v. Reed*, 47 F.3d 288, 291 (8th Cir.1995) (holding that § 1341's mailing requirement
was satisfied by the defendant's mailing of bank statements to an accountant).

[50] *United States v. McNeil*, 320 F.3d 1034, 1040 (9th Cir. 2003); *see also Fountain v. United States*, 357 F.3d 250,
255 (2d Cir. 2004) ("[T]he essential elements of a mail [or wire] fraud violation are (1) a scheme to defraud, (2) money
or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme." (quoting *United
States v. Dinome*, 86 F.3d 277, 283 (2d Cir.1996))).

0053.6416 – Final – September 20, 2022

Attorney–Client Privileged
Confidential

the union.[51] The two were found guilty of mail fraud for submitting expense vouchers for reimbursement of <u>meals and plane tickets that had no relation to union business</u>.[52]

In another instance, multiple officers and employees of the Washington Teachers Union, including the president, treasurer, and office manager, were charged with mail and wire fraud, embezzlement, conspiracy, and various other crimes as a result of frauds perpetrated against the union.[53] The defendants charged <u>union credit cards for thousands of dollars in personal expenses</u>, deposited union funds in the defendants' personal accounts, and wrote fraudulent union checks to cover personal expenses.[54] The treasurer of the union was ultimately convicted on all counts and sentenced to 120 months imprisonment.[55]

More recently, the former president of a New York City police union was charged in federal district court due to his alleged misuse of union resources.[56] The former president faces wire fraud charges stemming from his alleged misuse of union funds, including "turning in fraudulent expense reports, inflating costs and <u>charging for meals and groceries that weren't business related</u>."

These examples demonstrate the potentially severe consequences that individuals may face as a result of improper use of union resources. Further, these cases make clear that an individual may face conviction under federal fraud statutes not only from the actual theft of union funds, but also from the purchase or expensing of goods and services that are not legitimately for a union purpose.

As a result, the focus of the analysis depends on whether a particular expense serves a legitimate union purpose. Thus, exorbitant meal or drink expenses which exceed those necessary to serve the union purpose, or alternatively, reasonable expenses that do not include a discussion or furtherance of union business, may fall within the purview of the above-discussed violations and lead to strict penalties. Accordingly, it is imperative that each and every expense incurred using union funds serves a legitimate business purpose. A best practice is to list the attendees at a meal and the business purpose on the back of the receipt. 29 C.F.R. § 1.62 – 2(c).

The LMRDA has various record keeping requirements which include, but are not limited to: (1) accurate contemporaneous records reflecting all union receipts and disbursements; (2) supporting documents reflecting the entry of transactions into the union's accounts and their reproduction in the annual financial statements; and (3) any interim financial records that can serve to check the annual report.[57]

---

[51] *United States v. Browne*, 505 F.3d 1229, 1241 (11th Cir. 2007).

[52] *Id.* at 1263.

[53] *United States v. Baxter*, 761 F.3d 17, 20 (D.C. Cir. 2014).

[54] *Id.* at 21.

[55] *Id.* at 22.

[56] Michael Sisak, *Ex-NYPD Union Boss Pleads Not Guilty to Fraud Charge*, THE ASSOCIATED PRESS (Feb. 23, 2022). https://apnews.com/article/police-new-york-george-floyd-manhattan-new-york-city-584db2717a2dc48782e881f40a9acffe.

[57] See United States v. Budzanoski, 462 F.2d 443, 450 (3rd Cir. 1972)

14

Attorney-Client Privileged
Confidential

## CONCLUSION

Our findings are as stated above that (1) Courts extend a deference to a union's interpretation of its own constitution, using a "reasonableness" standard; (2) a union's payments to its officers and employees, including salaries, benefits, and expenses, is likely limited by what is deemed reasonable under its constitution, as well as what is reasonable based on the individual representative's fiduciary duties; and (3) authorization of union payments by delegates of the convention is a defense to § 501 claims, although it may not completely block all such claims.

We believe the most important thing to take away from this memorandum is that it is in the best interest of the IBB for the International President to recommend and IEC to adopt a clear, concise and comprehensive "Expense Policy." At the very least, we recommend the IEC adopt interpretations and corresponding rules regarding expense reimbursement issues that are not clearly spelled out in the Constitution.

Once IBB has adopted the rules, we believe that it is critical that the rules be enforced consistently. Consistent enforcement, of course, requires checks and balances designed to verify consistent application of the policy. This does not mean everyone at IBB need to be treated the same, but there should be a rationale, which is articulated in writing if different rules are applied to different groups of people employed by IBB.[58] Finally, when there is to be an authorized deviation from the rules, there should be a written explanation of the exception and why there is an exception retained in IBB's records. In this case, inconsistent application might be worse than no rule.

Please let me know if you have any questions regarding this memo or the topics discussed herein.

*Michael J. Stapp, by mga*

Michael J. Stapp, GC

---

[58] For these purposes, Officers and Staff are employees.

15